IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| BRUCE LEE DUNN, et al., | Case No. 2:99-CV-145 TS |
| Defendants. | |

This matter came before the Court for a two-day bench trial on April 23-24, 2007.  The main issue before the Court was whether certain portions of Plaintiff's property at Scofield Reservoir was subject to a use right, allegedly held by Defendants per three underlying deeds, when the property is not covered by water of Scofield Reservoir.  Also addressed was the scope of the alleged use right, specifically, whether Defendants' current use is inconsistent with the flowage and storage of water, a limitation imposed by the governing deeds.

John K. Mangum and Jared C. Bennett, Assistant United States Attorneys, appeared as counsel for Plaintiff, the United States of America, seeking a further order quieting title in Plaintiff as to the remaining issues presented at trial.  E. Jay Sheen appeared and represented the Dunn and Pannier Defendants (Bruce Lee Dunn, Richard Dunn, Helen Dunn, Gladys Butler,

1

Lazy CP Limited Partnership, Clyde Pannier, general partner, and Joanne Granger).  Steven R. Paul appeared and represented the Jacobsen Defendants (Stephen C. Jacobsen, Charlyn J. Dalebout, Paul A. Mancina, Jr. as Personal Representative of the Estate of Frances Mancina, deceased, Helen L. Watts, John A. Watts, Hilda M. Hammond (formerly Hilda M. Madsen), Robert G. Hammond, and David R. Gunderson and Gayle L. Hunting as co-trustees of the Leona M. Gunderson Family Trust).

At trial, Plaintiff presented its case and called Alan Christensen and David Moore as witnesses.  The Dunn Defendants presented their case and called Clyde Pannier and Bruce Dunn as witnesses.  The Jacobsen Defendants presented their case and called Judith Lamb and Stephen Jacobsen as witnesses.  After the parties rested, the case was taken under advisement.

The Court, having observed and considered the witnesses' testimony, evidence presented at trial, and the parties' arguments, makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

Background

1.      This is an action to quiet title to land in various adjoining parcels of property located in Carbon County, Utah.

2.      Through its January 4, 2006 Memorandum Decision and Order Granting Partial Summary Judgment (the "January 2006 Order"),[1] the Court quieted title in Plaintiff as to all of the land that was the subject of the Amended Complaint, but found that there was a  genuine

---

[1]Docket No. 145.

issue of material fact as to whether certain limited parts of that property were burdened by a

disputed right to use a portion of the property when not covered by water of Scofield Reservoir.

<em>The Property in Dispute</em>

3.     The specific parcels (collectively, the "Disputed Property") that Defendants claim

are subject to a use right are as follows:

    a.     Defendants Bruce Lee Dunn and Richard C. Dunn claim an interest in two
parcels of real property in Carbon County, Utah, designated as parcel nos.
20-80-10 and 20-80-11 (subdivision of parcel 20-80-8) in the official
records of the Carbon County Recorder's Office and described as follows:

> *Beginning at a point which is 289.69 feet North along the section line
> from the Southwest Corner of Section 10, Township 12 South, Range 7
> East, Salt Lake Base & Meridian, and running thence: East 430.00 feet,
> thence North 78.90 feet, thence West 430.00 feet, thence South 78.90 feet
> to the Point of Beginning. Contains 0.779 Acres.*

*and*

> *Beginning at a point which lies 368.59 feet North along the section line
> from the Southwest Comer of Section 10, Township 12 South, Range 7
> East Salt Lake Base & Meridian and running thence; East 430.00 feet;
> thence North 78.91 feet; thence West 430.00 feet, thence South 78.91 feet
> to the point of beginning. Contains 0.779 Acres.*

    b.     Defendant Stephen C. Jacobsen and Defendant Charlynn J. Dalebout claim
an interest in a parcel of real property in Carbon County, Utah, designated
as parcel no. 2A-80 in the official records of the Carbon County Recorder's
Office and described as follows:

> *The West ½ of the Southwest 1/4 of the Southeast 1/4 of Section 10,
> Township 12 South, Range 7 East of the Salt Lake Meridian.*

    c.     Defendant Paul Mancina claims an interest in a parcel of real property in
Carbon County, Utah, designated as parcel no. 2A-80-1 in the official
records of the Carbon County Recorder's Office and described as follows:

> *Beginning at a point North 895 feet and East 525 feet from the Southwest
> comer of section I0, Township 12 South, Range 7 East of the Salt Lake
> Meridian and running  thence West 120 feet; thence North 08 degrees East*

3

*72 feet; thence North 26 degrees 15 minutes West 125 feet; thence North 13 degrees West 65 feet; thence east 240 feet to the county road right of way; thence in a curve to the left having a radius of 420 feet for a distance of 275 feet, more or less to the point of beginning.*

d.   Defendants Helen L. Watts and John A. Watts claim an interest in a parcel of real property in Carbon County, Utah, designated as parcel no. 2A-80-2 in the official records of the Carbon County Recorder's Office and described as follows:

*The East ½ of the Southeast 1/4 of the Southwest 1/4 of Section 10, Township 12 South, Range 7 East of the Salt Lake Meridian.*

e.   Defendant Hilda M. Hammond claims an interest in a parcel of real property in Carbon County, Utah, designated as parcel no. 2A-80-3 in the official records of the Carbon County Recorder's Office and described as follows:

*The West ½ of the Southeast 1/4 of the Southwest 1/4 of Section 10, Township 12 South, Range 7 East of the Salt Lake Meridian.*

f.   Defendants David R. Gunderson and Gayle L. Hunting (as co-trustees of the Leona M. Gunderson Family Trust) claim an interest in a parcel of real property in Carbon County, Utah, designated as parcel no. 2A-84 in the official records of the Carbon County Recorder's Office and described as follows:

*The East ½ of the Southwest 1/4 of the Southeast 1/4 of Section 10, Township 12 South, Range 7 East, Salt Lake Base and Meridian.*

g.   Defendants (1) Helen Watts and John Watts; (2) Stephen Jacobsen and Charlyn Dalebout; (3) Hilda Hammond; and, (4)  David R. Gunderson and Gayle L. Hunting each claim an undivided 25% interest in parcel no. 2A-80-4 of the official records of the Carbon County Recorder's Office and described as follows:

*Beginning at a point 895 feet North and 330 feet East, more or less, East of the Southwest corner of Section 10, Township 12 South, Range 7 East, Salt Lake Base and Meridian, a point which is in the Paul Mancina South fence line and on the High water line, and running thence Northwesterly 250 feet, more or less, along the high water line to a point in the Paul Mancina North fence line;*

4

*and running thence North 175 feet, more or less to the forty line; thence West 590 feet, more or less to the North west corner of the forty line, thence South 425 feet, more or less; thence East 300 feet, more or less to the point of beginning.*

and

*Beginning at a point 447.5 feet, more or less, North of the Southwest corner of Section 10, Township 12 South, Range 7 East, Salt Lake Base and Meridian, and running thence East 430 feet, more or less, to the State Road right-of-way; thence Northeasterly along the State Road right-of-way to the Paul Mancina South fence line; thence West 430 feet, more or less, to the forty line; thence South 447.5 feet, more or less, to the point of beginning. (Less the State Road right-of-way.)*

and

*Beginning at a point 447.5 feet North and 430 feet East of the Southwest corner of Section 10, Township 12 South, Range 7 East, Salt Lake Base and Meridian; thence East 890 feet to the forty line; thence North 722.5 feet; thence West 630 feet, more or less; thence Southwesterly along the State Road right-of-way to the point of beginning, less the State Road right-of-way and the railroad right-of-way.*

h.    Defendant Gladys P. Butler claims an interest in a parcel of real property in Carbon County, designated as parcel no. 2A-80-6 in the official records of the Carbon County Recorder's Office and described as follows:

*Beginning 1320 feet North and 890 feet east of the Southwest corner of Section 10, Township 12 South, Range 7 East of the Salt Lake Meridian; thence East 430 feet to the forty line; thence South 150 feet; thence West 430 feet; thence North 150 feet to the point of beginning (less the State Road right-of-way).*

i.    Defendant Lazy CP "P" Ltd. Partnership, whose general partner has been Clyde "Bud" Pannier, claims an interest in a parcel of real property in Carbon County, designated as parcel no. 2A-80-7 in the official records of the Carbon County Recorder's Office and described as follows:

*Description: Beginning at the Southwest Corner of Section 10, Township 12 South, Range 7 East, Salt Lake Base & Meridian; Thence North Two Hundred Twenty-three and Seventy-five-hundredths (223.75) feet; Thence East Four Hundred Thirty (430) feet; thence South Two Hundred Twenty-three and Seventy-five-hundredths (223.75) feet; Thence West Four*

> *Hundred Thirty (430) feet to the point of beginning (Less the State Road right-of-way).*

    j.    Defendant Gladys P. Butler claims an interest in a parcel of real property in Carbon County, designated as parcel no. 2A-151in the official records of the Carbon County Recorder's Office and described as follows:

> *The Southwest 1/4 of the Southwest 1/4 of Section 11, Township 12 South, Range 7 East of the Salt Lake Base and Meridian.*

4.    This Disputed Property adjoins part of the south side of the east arm of Scofield Reservoir.

### *The Three Deeds*

5.    The Disputed Property is described in the 1927 Price River Water Conservancy District ("PRWCD") Deed (the "1927 PRWCD Deed"), as set forth in more detail below.  The 1927 PRWCD Deed is the third of three related deeds to adjoining property.  All three of these deeds were executed by the same grantors in a three-day period in September of 1927.  The common grantors were E.B. Jorgensen and his wife Gertrude S. Jorgensen, of Salt Lake City.

6.    The first deed (the "Railroad Deed")—recorded last among the three deeds—is a warranty deed dated September 20, 1927, to the Denver and Rio Grande Western Railroad Company, as grantee.  The Railroad Deed conveyed a 200 foot wide ribbon of land ("the railroad right of way"), 100 feet on either side of the centerline of the track of the route of the then-existing relocated Pleasant Valley line of the railroad.

7.    The second deed (the "1927 Madsen Deed")—recorded first among the three deeds—is a quitclaim deed dated September 21, 1927, to two brothers, Neil M. Madsen of Price, Carbon County, and Andrew C. Madsen, of Mt. Pleasant, Sanpete County.  The 1927 Madsen

Deed quitclaimed, among other parcels, a fee simple interest in the property east and south of the Railroad Deed, to which it referred.  This land was generally higher in elevation than the land to the west and north of it.

8.      The third deed—the 1927 PRWCD Deed—is a warranty deed to PRWCD, a public corporation, dated September 22, 1927.  PRWCD was then the owner and operator of a smaller predecessor reservoir to what is now Scofield Reservoir.

9.      The 1927 PRWCD Deed conveyed, among other lands, the land west and north of the Railroad Deed, to which the 1927 PRWCD Deed also referred.  This land was generally below or lower in elevation than the land to the east and south of it.  This deed was the second recorded of the three deeds, being recorded on November 2, 1927, minutes after the 1927 Madsen Deed was recorded.

10.     The 1927 Madsen Deed contains three separate paragraphs describing the various lands quitclaimed thereby.  The language of the 1927 Madsen Deed describes, in part, land immediately adjacent to the Disputed Property—specifically, that located on the south and east side of the railroad right of way.  The 1927 Madsen Deed does not explicitly describe the Disputed Property.

11.     As to each portion of land quit claimed, the 1927 Madsen Deed grants

the right on the part of the grantees, their heirs, administrators and assigns to use any part or portion of said subdivision of land below and between the . . . 7630 contour line and the waterline of said reservoir, when the same are not actually covered by the water therein, for any and all purposes not inconsistent with the flowage and storage of water thereon[.]

7

12.     The 1927 PRWCD Deed contains several paragraphs describing the various lands conveyed and warranted thereby, including the Disputed Property.  After several paragraphs of relevant land descriptions, the 1927 PRWCD Deed states that the grants are made "subject to right to graze or otherwise use any portion of said lands where not actually covered by water of grantee's reservoir, heretofore granted to Neil M. Madsen and Andrew C. Madsen."

13.     Through its January 2006 Order Granting Partial Summary Judgment, this Court

> conclud[ed] that the 1927 Madsen Deed [discussed in more detail below] is ambiguous as to whether or not, for the property in question in this action in sections 10 and 11 (mentioned in the first paragraph of the lands description in that 1927 Madsen Deed), the Madsen grantees and their successors were given any of the reserved rights to use those lands when not submerged by waters of the [Scofield R]eservoir, as was more clear for the different lands described in later paragraphs of that deed.[2]

*The Two Dams and Early Transfers of Interest*

14.     The original Dam at Scofield Reservoir was referred to as the Pleasant Valley Dam, and was build in 1925-26 by the PRWCD.

15.     The Pleasant Valley Dam was to be replaced by a new and larger dam, eventually located 800 feet downstream from the Pleasant Valley Dam.

16.     This later dam was built by the Bureau of Reclamation ("BOR") between the years of 1943 and 1946, and is the current dam at Scofield Reservoir.

---

[2]Docket No. 145.

17.     Previous to construction of the new dam, efforts were made by the United States to ensure the new dam was properly built and necessary property rights were secured, including purchasing property from the Madsens in Section 10, above the railroad to facilitate the relocation of the roadway and railroad rights of way.[3]

18.     By 1944, the Madsens involved with E.B. Jorgensen and the 1927 Madsen Deed had passed away, except for Anna Madsen.

19.     By quitclaim deed dated February 5, 1945, and recorded August 9, 1945, PRWCD conveyed the lands it owned relating to the Scofield Reservoir to the United States.

20.     The February 5, 1945 deed included all of the land in the 1927 PRWCD Deed and other adjoining or nearby lands acquired by PRWCD.

Extrinsic Evidence

*Plaintiff's Conduct*

21.     In January of 1946, pursuant to an inquiry by BOR regarding the grant of an easement to the State for a highway, the regional counsel of the Solicitor's office of the United States Department of the Interior opined that interpreting the 1927 PRWCD Deed to include a right to graze or otherwise use the Disputed Property when not covered by water would be incorrect.[4]

---

[3]Pl.'s Exs. 12, 40; R. at 39:22-25, 54-55.

[4]Pl.'s Ex. 57; R. at 182:2-13.

22.     On or about November 17, 1959, the BOR represented on a map prepared by BOR employees that the Disputed Property was held as "Fee title in the U.S. subject to grazing and any other use except when inundated."[5]

23.     In August of 1968, pursuant to another inquiry by the BOR, the Solicitor's office of the United States Department of the Interior concluded that "[a]pparently the intention of the grantor Jorgensen was to convey the whole title to that portion [of the disputed property] to the [PRWCD] without any restriction whatsoever."[6]

24.     In March of 1968, Foster Lamb, an appraiser for the BOR, concluded in an appraisal report ("First Lamb Appraisal") concerning lands which included the Disputed Property, that no private party owned any shoreline surface use rights, and proceeded to assign a zero value to such lands.[7]

25.     In June of 1976, the BOR sent notices to property owners occupying the Disputed Property indicating that they were trespassing on government land.[8]  The BOR held a meeting on the issue, which several of the Defendants attended, and the meeting was subsequently resolved in favor of the position of a use right in Defendants, except when the property was under water.[9]

---

[5]Def.'s Ex. B; R. at 101-02.

[6]Pl.'s Ex. 55, at 2-3.; R. at 189:24-192:9.

[7]Pl.'s Ex. 50; R. at 187:1-189:1.

[8]Def.'s Ex. HH.; R. at 301:4-22.

[9]R. at 255:6-11, 18-23; 303-04; 319:1-11.

26.     In 1986, BOR commissioned an appraisal ("Second Lamb Appraisal") of a portion of the Disputed Property from its former employee, Foster Lamb.[10]

27.     In a letter dated September 23, 1986, by Mr. Leon Mason, chief appraiser of the Upper Colorado Region of the BOR, Mr. Mason represents that the purpose of the Second Lamb Appraisal was to acquire the rights of the Madsen family to a portion of the Disputed Scofield Reservoir Property—specifically, the Singleton Boat Camp discussed in more detail below—for use other than flooding as needed by the United States.[11]

28.     The first full paragraph of Mr. Mason's evaluation of the Second Lamb Appraisal states: "This appraisal involves an unusual situation where the federal government has fee title to the land for flooding purposes only.  The theoretical underlying estate of all uses other than flooding is the most useful."[12]

29.     The letter goes on to state that

According to what the Appraiser can best determine fee title to the subject tract is held in the United States, subject to grazing and any other use except when inundated by the Schofield [sic] Reservoir.  This right to use the subject parcel for other purposes is owned by the Madsen Family.[13]

---

[10]Pl.'s Ex. 50.

[11]Def.'s Ex. H.

[12]*Id.*

[13]*Id.*

30.     Finally, the letter states that "[t]he [Disputed Property] was originally acquired by the Price Water users from the Madsen family, reserving to the Madsens the rights to graze and use for any other use except when inundated."[14]

31.     By letter dated July 21, 1989, the BOR represented to Mike Jackson, Superintendent of Scofield, Utah State Parks Department, that the Scofield Reservoir Property was acquired in fee title by the United States, but that "[t]he deeds reserved the rights of the former owners to retain grazing and other uses except when inundated."[15]

32.     The letter to Mr. Jackson was written to clarify the BOR's then current policy regarding access to and use of the Scofield Reservoir Property, written to the state agency with whom the BOR contracts to run the day-to-day operations of Scofield Reservoir.[16]

33.     The letter indicated that the BOR had "made a determination with respect to the public use of these lands" and that determination was that the public could cross the lands but could not "damage fences or other structures constructed in connection with the grazing and other uses."[17]

---

[14]*Id.*

[15]Def.'s Ex. J; R. at 107-108.

[16]R. at 110:10-14.

[17]Def.'s Ex. J; R. at 109.

34.     The letter to Mr. Jackson in 1989 included as an attachment the 1959 BOR map, created thirty years earlier but still used by the BOR to show the state of title of the subject lands.[18]

35.     In 1991, the BOR acquiesced to the building of a sewer system near the Mancina Home, discussed below, on the Disputed Property.[19]

36.     In 1999, Mr. Christensen, a BOR engineer, together with his supervisor, David Kreuger, concluded, pursuant to an investigation, that no private parties owned any surface use rights in the disputed property.[20]

37.     Plaintiff filed this action on March 5, 1999.

*Defendants' Conduct*

38.     From 1927 until 1945, the Madsens used the Disputed Scofield Reservoir property to graze sheep and cattle, as well as to farm.[21]

39.     During, and after, the construction period for the new dam, the Madsens continued to graze and farm on the property, as well as lease it for the purpose of maintaining boat camps.[22]

---

[18]Def.'s Ex. J; R. at 108.

[19]R. at 293:13-294:9.

[20]*Id.* at 13:14-14:7.

[21]*Id.* at 138:3-7; 252;19-25.

[22]*Id.* at 239:18-19; 240:10-16; 241:21-24; 243-246.

13

40.     A  commercial boat camp—the Singleton Boat Camp—which would accommodate trailers and rent boats, and two "non-portable" cabins existed on the disputed property at least by 1945.[23]

41.     Over the years, homes and other structures have been erected on the Disputed Property.[24]

42.     For example, Lee Diamante leased property from the Madsens, located within the Disputed Property, and operated a café and bar on the Disputed Property during the early 1950s.[25]

43.     The Mancina Home, mentioned above, has been on the Disputed Property since approximately 1952.[26]

44.     The Panniers built a cabin on the Disputed Property around 1960.[27]

45.     At least two small cabins were constructed by the Madsens on the land as semi-permanent structures.[28]

46.     The Jacobsen branch of the Madsen family has not placed cabins on the Disputed Property.[29]

---

[23]*Id.* at 243:11-25; 244:1-245:1-5; 246:6-12.

[24]*Id.*

[25]*Id.* at 244-245:1-5.

[26]*Id.* at 291:22-293:11.

[27]*Id.* at 240:1-16.

[28]*Id.* at 241:7-10.

[29]*Id.* at 315:1-6.

47.     None of the structures on the Disputed Property were ever made available for use by the general public.  The Disputed Property was fenced by the Madsens and their descendants or successors on a continual basis since the mid-1950s, including no trespassing signs and locked gates.[30]

48.     The land has been on the county's tax rolls during the entire time at issue, and taxes have been paid by Defendants or their predecessors.[31]

49.     Throughout the 1960s and 1970s, at times, various members of Defendants' families have transferred portions of the Disputed Property, and said transfers were made without searching title, or obtaining warranty of title, title reports, or title insurance.[32]

<u>Flow and Storage of Water at Scofield Reservoir</u>

50.     The Disputed Property exists below the pre-1927 datum elevation of 7630 feet, which is, converted to post-1927 datum, an elevation of 7634.6 feet.[33]

51.     At the time the relevant deeds were entered into, the parties to those deeds anticipated that the existing predecessor dam would eventually be enlarged to an elevation of 7635 pre-1927 datum feet.[34]

---

[30]*Id.* at 246:10-16; 247; 250:18-24; 292:1-8.

[31]*Id.* at 300:14-20.

[32]*Id.* at 298:24-299:15; 287:3-7.

[33]Pl.'s Exs. 6, 21; R. at 44:3-16; 45:23-46:5.

[34]Pl.'s Ex. 21; R. at 44:3-16.

52.     The 7630 contour line mentioned in the deeds was anticipated by the parties to the deeds to be an eventual high water mark for the Scofield Reservoir, five feet below the enlarged dam elevation.[35]

53.     A dam enlargement very similar to, if not identical to, that anticipated by the parties to the deeds at issue was achieved by BOR's construction of the current dam at Scofield in the 1940s.[36]

54.     For example, the design criteria for the current dam projected a high water mark of 7630 feet.[37]

55.     In theory, the water surface of Scofield Reservoir could reach a level of 7636.5 feet; however, this probability is at least lower than that of a 100-year storm.[38]

56.     The historic high water level recorded to date at Scofield Reservoir is 7621.5 feet above sea level.[39]

57.     Were the existing structures on the Disputed Property threatened with inundation, it would likely take heavy equipment to move some of them.[40]

---

[35]R. at 45:23-46:6.

[36]*See id.* at 45:23-46:5.

[37]Pl.'s Ex. 11, at 4; Ex. 54; R. at 90:10-11.

[38]R. at 155:5-13.

[39]Pl.'s Ex. 53, R. at 81:15-22.

[40]R. at 272:18-272:3.

16

58.     Water levels at Scofield may change relatively rapidly and have been documented to change as much as one to one-and-a-half feet per day for several weeks.[41]

59.     Such changes in water level may cause scouring, which dislodges material from the shoreline.

60.     Dislodged material may hinder the function of outlet works at the Scofield Reservoir Dam by creating clogging.

61.     To date, none of the structures on the Disputed Property have been inundated.[42]

62.     To date, reservoir scouring has damaged the landscaping on one portion of the property within the Disputed Property.[43]

---

[41]*Id.* at 83:1-20.

[42]*Id.* at 253:1-15.

[43]*Id.* at 294:21-22.

## II.  CONCLUSIONS OF LAW

<u>Burden of Proof in Action</u>

63.     In an action to quiet title, "the plaintiff must succeed by virtue of the strength of his own title rather than the weakness of defendant's title."[44]

64.     "[N]evertheless all the plaintiff need do is to prove prima facie that he has title, which if not overcome by defendant, is sufficient."[45]

<u>Defendants' Use Right</u>

*Ambiguity*

65.     Under Utah law, "[i]f the court finds [that] the agreement is integrated, then parol evidence may be admitted only if the court makes a subsequent determination that the language of the agreement is ambiguous."[46]

66.     There has been no dispute in this action that the deeds at issue were not integrated. Nonetheless, the Court here makes the preliminary and formal finding that the deeds are integrated.

67.     Pursuant to the January 2006 Order, this Court determined, through summary judgment, and on all relevant credible evidence presented, that the deeds at issue—particularly the1927 PRWCD and Madsen Deeds—were ambiguous.  No motion to amend or reconsider this

---

[44]*Ash v. State*, 572 P.2d 1374, 1376 (Utah 1977).

[45]*Id.*

[46]*Tangren Family Trust ex rel. Tangren v. Tangren*, 2006 UT App 515, ¶ 10, 154 P.3d 180; *see also The Cantamar, L.L.C. v. Champagne*, 2006 UT App 321, ¶ 142 P.3d 140 (noting that Court should make a preliminary consideration of all credible evidence, as opposed to mere consideration of four corners of document).

18

finding was filed.  The issue of whether the deeds are ambiguous, to the extent presented, was

not properly before the Court at trial, as it had been previously found as a matter of law.[47]

                    *Resolution of the Ambiguity*

68.     It is this Court's role to attempt to resolve the ambiguity in order to "ascertain the

intention of the parties, especially that of the grantor."[48]

69.     Because the parties to the ambiguous deeds have long since passed away, the

Court finds most relevant that evidence presented at trial which reaches furthest back in time to

the date of the relevant deeds and the parties to them.

70.      The extrinsic evidence which was presented at trial, and which reaches furthest

back to the date of the deeds, supports that it was the intent of E.B. Jorgensen and his wife to

grant the Madsens a use right on the Disputed Property.

71.     For example, as described by descendants within the Madsen family, the Madsens

who were parties to, or rather, grantees of the 1927 Madsen Deed actually used the Disputed

Property in a manner which would have been consistent with the grant of a use right referred to

in the 1927 PRWCD Deed.

---

[47]*See also* Order on Motions in Limine, Docket No. 213 at 8 ("As should be apparent, to date, this Court has held that the 1927 Madsen Deed is ambiguous, and that is why we have proceeded to this stage.")

[48]*See Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979).  The Court notes that the Utah rule of deed construction that "the courts will resolve all doubts in favor of the free and unrestricted use of property" does not apply once it has been determined that a deed is ambiguous.  *See Panos v. Olsen and Assoc. Const., Inc*., 2005 UT App 446, ¶¶ 15, 18, 123 P.3d 816 (applying rule in concluding that no ambiguity existed in deed).  Application of the rule otherwise could subvert ascertaining the true intention of the parties to the deeds at issue.

72.     Moreover, this use continued uninterrupted by the descendants of the Madsen family and their successors in interest.

73.     Indeed, the witness testimony which reached furthest back to the date of the deeds at issue—that given by Mr. Pannier—indicated that a boat camp existed on the Disputed Property by 1945.

74.     On the other hand, Plaintiff did not present any extrinsic evidence, beyond testimony by Mr. Moore on the proper interpretation of deeds according to modern title insurers, tending to demonstrate a contrary intent, i.e., that E.B. Jorgensen and his wife— the grantors of the three deeds—did not intend to grant a use right to Defendants.

75.      The Court also finds that, while less probative to the ultimate issue, extrinsic evidence which is more distant, both temporally and in degree of relationship to the original parties to the deeds, supports the existence of a use right in Defendants.

76.     For example, there is no indication that PRWCD questioned Defendants' use of the Disputed Property previous to the quitclaim to Plaintiff in 1945.

77.     Despite Defendants' continuing use of the Disputed Property, BOR made no attempt to intervene during the period of land acquisition and/or preparation leading to construction of the new dam at Scofield Reservoir in the 1940s.

78.     In subsequent years, as Defendants' use of the Disputed Property continued, BOR, while directing two inquiries to the office of the Solicitor, first in 1946, then in 1968, which resulted in opinions consistent with the position taken by Plaintiff today, BOR has historically vacillated on its position regarding a use right in Defendants on the Disputed Property.

79.     Notably, despite the 1946 indication by the Solicitor's office that there was no use right, BOR proceeded to take the position that there was such a use right, as demonstrated by BOR's continued failure to intervene in Defendants' use of the Disputed Property and BOR's adoption of the 1959 map, which clearly represented a use right in Defendants.

80.     Oddly, despite the 1946 opinion, BOR thought it necessary to make a second inquiry to the Solicitor's office, identical to the first, regarding a use right in Defendants.

81.      While BOR seemed to adopt the Solicitor's 1968 opinion, as evidenced by the First Lamb Appraisal, and the actions leading to and including the 1976 meeting with Defendants, BOR seemingly returned to its original position after the 1976 meeting.

82.     During all of this time, Defendants continued, uninterrupted (excepting the 1976 meeting) with their use of the Disputed Property.

83.     BOR's 1976 re-adoption of its original position that its ownership interest was subject to Defendants' use right is further reflected through its 1986 documentation relating to the second Foster Lamb appraisal, the 1989 communications to the Utah State Parks Department, and its 1991 acquiescence to to the building of a sewer system near the Mancina Home.

84.     This 1999 suit reflects a second reversal of position by BOR.

85.     In short, the Court finds that the balance of the extrinsic evidence supports the conclusion that Defendants have a use right in the Disputed Property, and that Plaintiff has not met its burden of proof in light of Defendants' evidence.

86.     Accordingly, the Court resolves the ambiguity in the deeds at issue by concluding that Defendants have a use right in the Disputed Property.

Scope of Defendants' Use Right

87.     As per the 1927 Madsen Deed, Defendants' and their successors' right is

to use any part or portion of said subdivision of land below and between the . . .
7630 contour line and the waterline of said reservoir, when the same are not
actually covered by the water therein, for any and all purposes not inconsistent
with the flowage and storage of water thereon[.]

88.     As a preliminary matter, the Court notes that there is *very* little evidence before it

regarding grantor intent as to what type of purposes are "not inconsistent with the flowage and

storage of water."

89.     However, because the 7630 contour line was anticipated to be a high water mark

for the Scofield Reservoir,[49] the Court finds that the parties to the deeds at issue would have

understood that the property subject to Defendants' use right could be completely inundated at

times, however infrequently.

90.     Moreover, the undisputed evidence shows that at least some of Defendants'

structures, if subject to reservoir scouring and/or inundation, could impede water flow and

storage.[50]  There is no reason to believe that this dynamic would not have been present and

understood by the parties to the relevant deeds, particularly the grantor.

---

[49]*See supra*, at ¶ 52.

[50]R. at 88:21-89:18.

91.     Therefore, the Court finds that any permanent structures on the Disputed Property, such as the Mancina Home, fall outside the scope of Defendants' use right because placement of permanent structures is clearly inconsistent with the flowage and storage of water as such structures may not be timely moved should a threat of scouring and/or inundation arise.

92.     Also, in the absence of any evidence to the contrary, the Court finds that Defendants' fencing is *not* a use inconsistent with the storage and flow of water, in part, because such would be an incident of grazing, a use explicitly mentioned in the 1927 Madsen Deed, and a use clearly practiced by the original Madsens, parties to the 1927 Madsen Deed.

93.     However, it is much less clear whether the parties to the deeds at issue anticipated that a large portion of the disputed property would be frequently inundated, thereby precluding use of semi-permanent and/or mobile structures on the property.

94.     Absent one modern incident of minimal scouring of shoreline landscaping, from which there is no evidence of impediment of water storage or flow and which was subsequently corrected by Defendants' installation of rip-rap,[51] none of Defendants' past or current uses of the Disputed Property, including the placement of structures, has been subject to inundation or scouring—the triggering events which would render use inconsistent with the flowage and storage of water—even during high water years.

95.     Unfortunately, the Court has little or no evidence before it regarding the issues of the precise locations of and probabilities that Defendants' structures could be inundated; nonetheless, the Court acknowledges that such events may be possible.

---

[51]*See supra*, at ¶ 62.

96.     Therefore, the Court, in articulating the intent of the parties to the deeds at issue based on the evidence presented at trial, finds that, to the extent that Defendants' semi-permanent or mobile structures, excluding fencing, are reasonably threatened with imminent scouring and/or inundation, and cannot or will not be relocated, for any reason, such structures are inconsistent with the flowage and storage of water according to the deeds at issue.

97.     The Court finds such structures to comprise:

a.      those which cannot or will not be relocated—where such relocation prevents scouring and/or inundation of the structure,

b.      by Defendants,

c.      at least one week before a rising water level from the reservoir, as determined by BOR,

d.      reaches an elevation where contact between the structure and the shoreline would occur, were the then present and rising water level 10.5 feet higher in elevation.

98.     The Court bases this determination upon the following:  in the face of rising water levels and a reasonable threat of imminent inundation, to the extent Defendants' structures on the disputed property will not or cannot be moved to higher ground at least one week before a reasonable threat of inundation, as measured by the most rapid recorded reservoir water level fluctuations represented by Plaintiff,[52] any such structures are inconsistent with the flowage and storage of water as they may introduce debris to the outlet works of the dam.

---

[52]*See supra*, at ¶ 58.

99.     In reaching this conclusion, the Court notes that there is no evidence which contradicts that the original parties to the deeds at issue would not have contemplated reservoir water level fluctuations such as those presented by BOR.

## III.   CONCLUSION

For the foregoing reasons, it is therefore

ORDERED that Defendants have a use right on the abovementioned properties to use any part or portion of them below and between the 7630 (pre-1927 datum) contour line and the waterline of Scofield reservoir, when they are not actually covered by the water therein, for any and all purposes not inconsistent with the flowage and storage of water thereon.  It is further

ORDERED that all permanent structures located on the Disputed Property, including the Mancina Home, are inconsistent with the flowage and storage of water on the Disputed Property. It is further

ORDERED that Defendants' fences are not inconsistent with the flowage and storage of water.  It is further

ORDERED that all semi-permanent or mobile structures are inconsistent with the flowage and storage of water on the Disputed Property if, given the reasonable threat of imminent inundation, they cannot or will not be relocated—where such relocation prevents inundation of the structure—by Defendants, at least one week before a rising water level from the reservoir (as determined by BOR) reaches an elevation where contact between the structure and the shoreline would occur, were the then present and rising water level 10.5 feet higher in elevation.

SO ORDERED.

DATED   July 16, 2007.

BY THE COURT:

_____

TED STEWART
United States District Judge